# JUNE, 1944

R. D. MacDonald et al. v. Lewis H. Follett et al.

No. 8208. Decided April 19, 1944
Rehearing overruled June 7, 1944.
(180 S. W., 2d Series, 334)

*W. J. Howard, Merrill & Scott* and *Sam R. Merrill,* all of Houston, for petitioners, MacDonald et al.

The estates held by the several owners of overriding, non-participating, royalties carved out of the lesees's working interest under an ordinary commercial form of oil, gas and mineral lease, are not, in the absence of language to that effect in the instrument reserving or assigning such oil interest, of such character as to create between them the fiduciary obligation and relationship incident to ordinary tenancies in common. Caruthers v. Leonard, 254 S. W. 779; Montgomery v. Phillips Pet. Co., 49 S. W. (2d) 967; Harrison v. Barngrover, 72 S. W. (2d) 971; 31 Tex. Jur. 941, sec. 253; 3 Summers Oil and Gas 320, sec. 554.

*Lewis H. Follett, Cleveland Davis, John C. Henderson,* and *Floyd Enlow,* all of Angleton, for respondents, Folletts, et al.

In reply to the above proposition of petitioners, respondents cite: Broughan v. Thompson, 145 S. W. (2d) 1115; Frankling Mining Co., v. O'Brien, 22 Colo. 129, 55 Am. St. Rep. 118, 43 Pac. 1016; Davis v. Vidal, 105 Texas 444, 151 S. W. 290, 42 L. R. A. (N. S.) 1084; 4 Pomeroy Eq. Jur. (5th Ed) 108, sec 1050.

MR. JUDGE HICKMAN of the Commission of Appeals, delivered the opinion for the Court.

This is an action in trespass to try title brought by Lewis H. Follett and Mrs. Lottie B. Folett against R. D. MacDonald and others to recover, upon the theory of a constructive trust, an undivided one-half interest in a one-thirty-second overriding royalty under mineral leases executed in 1938. As will be disclosed below, leases were executed in 1934, renewed in 1937, and again in 1938, but the interest sought to be recovered in this case was carved out of the 1938 leases. In the trial court a preemptory instruction was given and judgment entered in favor of the defendant oil companies who were operating the leases and certain interest holders thereunder. No challenge was made in the Court of Civil Appeals of that portion of the trial court's judgment and same was accordingly affirmed. It is still unchallenged and will not be disturbed here. As between the Folletts and the MacDonalds the trial court peremptorily instructed a verdict in favor of the former against the latter and judgment was entered awarding them a one-half interest in the overriding royalty. Our opinion will be confined to a consideration of the case as between them. The Court of Civil Appeals on this phase of the case reversed the trial court's judgment and remanded the cause. 175 S. W. 2nd 671.

The principal parties are Lewis H. Follett and R. D. MacDonald. Each filed an application for writ of error and both applications were granted, the result being that each is both petitioner and respondent and, in order to avoid confusion, we shall refer to them by their names and discuss the case just as if they were the sole parties to the litigation.

Our opinion will first be directed to a consideration of MacDonald's contention that no relationship of trust and confidence existed between him and Follett; that there was no basis for the application of the doctrine of constructive trusts, and that therefore a peremptory instruction in his favor should have been given. In considering that question we must view the case from Follett's standpoint and state the evidence in the light most favorable to him. Thus stated the material facts are substantially as follows:

The case stems back to negotiations had in 1932. At that time it was thought that the territory adjacent to a lake called Old Ocean, in Brazoria County, was prospective oil territory. Bernard River Land Development Company, a corporation, of which MacDonald was President and largest stockholder, owned large tracts of land in the vicinity of Old Ocean as did also certain

citizens of Iowa, who will be referred to as the Muellers. For many years prior to 1932 Follett had represented the Muellers as their attorney in Brazoria County. In July, 1932, MacDonald wrote the Muellers asking whether they would be interested in joining him and another landowner in getting up a block of leases in the vicinity of Old Ocean with a view of procuring someone to make a test for oil. In reply the Muellers expressed an interest in the proposition, but referred MacDonald to their attorney, Follett, who was to approve the terms of any lease which they might thereafter execute. As a result of this correspondence Follett and MacDonald met several times in the late summer of 1932. In the course of these meetings they entered into an agreement for the acquisition by them personally in the future of overriding royalties under leases to be negotiated for MacDonald's company and Follett's clients, the Muellers. Follett testified that he and MacDonald agreed that to the extent he had authority to do so, he would include the Mueller lands with the lands of MacDonald's company to try to interest some operators. Follett did not charge the Muellers for this service in looking after the leasing of their land, but was privileged by them to procure, if he could, overriding royalties. He testified that it was agreed between him and MacDonald that whatever "overrides" they would receive they would divide, subject to the approval of the Muellers. By the term "overriding royalty" as used herein is meant a given percentage of the gross production carved from the working interest, but, by agreement, not chargeable with any of the expenses of operation.

In 1934 certain oil companies agreed with MacDonald that they would pay a certain cash bonus for two leases on the Mueller land totalling 570 acres, and that they would carry one-thirty-second overriding royalty interest to be owned by MacDonald and Follett. With the consent of the Muellers, Follett and MacDonald agreed that such overriding royalty should be so acquired and owned by them. By agreement of Follett, MacDonald and the Muellers one Poutra, MacDonald's secretary, was named as the lessee in such leases and the transaction was handled in this manner: Poutra conveyed the one-thirty-second overriding royalty to Follett to be held by him for himself and MacDonald. Follett accepted the conveyance and in turn conveyed one-half thereof to MacDonald. Poutra then assigned the leases to the oil companies which paid the Muellers the agreed bonus.

The primary term of the leases above mentioned was three years. Follett testified that between the date of their execution in 1934 and their termination in 1937 he and MacDonald had several conversations with regard to such leases and their over-

riding royalty interests held under them. MacDonald told him that the two leases assigned to the oil companies were quite valuable, and that, if the companies did not drill same before the expiration of the primary term, he wanted to secure renewals in order that the overriding royalty interest of both parties could be continued in force. Follett further testified that he told MacDonald that it was a very fine idea, and that the two would work together so that all parties would be protected. One specific meeting between MacDonald and Follett was described as follows:

"I met Mr. MacDonald at the corner of Texas and Main. The meeting was not prearranged, an accidental meeting. I stopped him and told him that the time was getting short on these leases, that is, the primary term was about to expire within the next month or two or three months, and I suggested to Mr. MacDonald that he go up and talk with Harrison & Abercombie and try to get them to renew these leases, suggesting to him that he try to get a fair price for Mr. Mueller. Mr. MacDonald told me he would do that, and when he got the proposition from Harrison & Abercombie he would communicate with me so that I in turn could submit that to Mr. Mueller. We, of course, discussed that we wished to renew the leases so as to continue our override in force."

Thereafter, according to Follett, MacDonald, without his knowledge and consent, went to Davenport, Iowa, and personally negotiated with the Muellers for renewal leases. The negotiations resulted in the execution of renewal leases by the Muellers in April, 1937. While MacDonald paid the consideration therefor, he was not out any money on the transaction but, on the contrary, made money by the transaction. In assigning these 1937 renewals to the operators a one-thirty-second overriding royalty was carved out of the working interest just as in the 1934 leases, but MacDonald never conveyed any interest in that to Follett.

The primary term of the 1937 renewal leases expired in April, 1940. In October, 1938, eighteen months before that expiration date, MacDonald, by direct negotiations with the Muellers procured top leases on the same lands to become effective on the date of the termination of the 1937 renewals. These top leases were later assigned to the same operators and a one-thirty-second overriding royalty was retained by MacDonald. Production was had under the 1938 top leases after the expiration of the 1937 renewals and by this action Follett seeks title to one-half of the one-thirty-second overriding royalty under such leases.

■ It is MacDonald's contention that at the time the 1938 leases were taken no fiduciary relationship existed between him and Follett, and that therefore no part of the overriding royalty retained by him under such leases is held in trust for Follett. Much is written in the briefs on the question of whether or not the relationship of tenants in common existed between Mac-Donald and Follett. We are not here concerned with the particular designation to be given the relationship between them. We would not hold that the mere fact that Follett and MacDonald each owned an undivided interest in the production from these leases, within itself, would make them tenants in common with all of the incidents growing out of such relationship. Neither would we hold that merely by assigning to MacDonald one-half of the overriding royalty under the 1934 leases a relation of co-tenancy was created. Whether or not joint owners of overriding royalty interests sustain relations of trust and confidence toward each other depends upon the facts and surrounding circumstances. They do not sustain that relationship by virtue alone of their being joint owners. Our question then is whether the facts above recited, viewed in the light most favorable to Follett's contention, raise an issue for the jury on the question of the existence of a relation of trust and confidence.

This is a suit in equity and in that realm the conduct of parties is judged by refined standards. No rules can be prescribed and no attempt should be made to formulate rules for the measurement of conduct by courts of equity, but that such conduct must be measured by standards exacting the utmost fidelity between the parties is universally recognized. We experience no difficulty in arriving at the conclusion that the facts above narrated, if found to be the true fact, establish that a relation of trust and confidence existed between Follett and MacDonald prior to the execution of the 1938 top leases.

■ In Pomeroy's Equity Jurisprudence, 4th Ed. Vol 3, Sec. 1050, will be found a very careful statement of the law, with citation of many authorities, on the question of renewal of leases by partners and other fiduciary persons. After announcing the general rule that one member of a partnership cannot, during the existence of a lease, take a renewal thereof for his own benefit to the exclusion of his fellows, but that a lease so taken innures to the benefit of the whole firm, it is stated that the rule is: "* * * a particular application of a broad principle of equity, extending to all actual and *quasi* trustees, that a trustee, or person clothed with a fiduciary character, shall not be permitted to use his position or functions so as to obtain for himself any advantage or profit inconsistent with his supreme duty to his beneficiary."

That rule is sound and we heartily subscribe thereto. If a relation of trust and confidence existed between MacDonald and Follett with reference to the overriding royalty under the 1937 leases, then such relationship was carried into the 1938 leases executed during the existence of that relationship. The question is thus reduced to the narrow inquiry of whether or not such relationship existed when the 1937 renewal leases were procured by MacDonald.

Under Follett's testimony above set out the manner to that question is not difficult to arrive at. In answering it we consider the evidence regarding the negotiations in 1932 as being valuable only to disclose the circumstances under which MacDonald and Follett were thrown together in connection with the Mueller lands. That evidence discloses that the lands belonged to Follett's clients and that MacDonald's rights were obtained only through dealings with Follett. Following the first negotiations the 1934 leases were executed and the overriding royalty conveyed to Follett and MacDonald derived his overriding royalty through a conveyance from Follett. With that status existing, if MacDonald agreed with Follett that he would take the matter of the renewal leases up with the oil companies, and that if he procured a proposition of renewal from them, would communicate with Follett, and, further, if in that connection, the parties disclosed their purpose to renew the leases so as to continue their overriding royalty interests in force, then MacDonald, while negotiating with the oil companies, was under fiduciary obligations to Follett, and when he procured from them an agreement that the one-thirty-second overriding interest might be continued under the renewal leases, that agreement was for the benefit of himself and Follett equally.

■ MacDonald presses the further contention that Follett is precluded from recovery of any interest under the 1938 leases by his conduct in undertaking to obstruct MacDonald in his efforts to secure the 1937 leases. This contention is not sustained. The record does disclose that Follett advised the Muellers by telegraph and telephone not to renew those leases at the time MacDonald was in Iowa. This was based upon his opinion that the Muellers should be paid as much as $5.00 per acre bonus. MacDonald was authorized to pay that much at that time and later was authorizzed to pay $6.00, but went up to Iowa offering $2.00, finally agreeing upon $4.00. MacDonald argues here that when Follett learned of his visit to Iowa and of its purpose he was then put to an election whether to assist him in securing the new leases and rely upon his claimed right to participate therein or to advise his clients against the execution thereof. We are in

complete disagreement with that contention. Follett's first duty was to his clients, the Muellers. To be put to an election implies that two valid courses of conduct are available between which to choose. There were not two courses available to Follett. When an attorney is faced with the question of whether or not he will be loyal to his clients, there is only one course available to him. Follett followed that course. He was true to his client and it is axiomatic that he could not thereby be false to anyone.

■ It is claimed by MacDonald that the cause of action asserted by Follett is barred by the four years statute of limitation. If his right to recover rested alone upon the original contract of 1932 there might be merit in this contention, but under our view the basis of his suit is to impress the overriding royalty interest with a constructive trust. Unless he can establish a relationship of trust and confidence in respect to the 1937 leases which was carried into the 1938 top leases, he has no cause of action. If he succeeds in establishing that relationship, then his suit is for an equitable title, as distinguished from a mere equitable right, and the four years statute of limitation (Art. 5531) is not applicable. Stafford v. Stafford, 96 Texas, 106, 70 S. W. 75; Hand v. Errington, (Com. App.) 242 S. W. 72; Johnson v. Wood, 138 Texas 106, 157 S. W. 2nd 146.

■ Follett in his application urges the point that the trial court correctly held that he established his right to the interest sued for a matter of law, and that judgment of that court in his favor based upon preemptory instruction should be affirmed. This contention is based primarily upon the ground that his testimony regarding the agreements between him and MacDonald after the execution of the 1934 leases and prior to the execution of the 1937 renewals established a constructive trust as a matter of law, and that MacDonald did not deny such testimony. As we read MacDonald's testimony he positively denied that he had these negotiations. At one place in his testimony he stated emphatically that he never did have any discussion with Follett in regard to securing extensions of the leases and protecting the overriding royalties. It is true that he admitted that "a fellow can be mistaken about anything," and also, in the main, his testimony was that he had no recollection of any such negotiations, but, taken as a whole, it certainly raises an issue of fact, which must be determined by the trier of facts.

The judgment of the Court of Civil Appeals affirm the trial

court's judgment in part and reverses and remands same in part, as indicated above. That judgment will be affirmed.

Opinion adopted by the Supreme Court, April 19, 1944.

Rehearing overruled June 7, 1944.