**WINN v. WARNER.**

No. 2665.

Court of Civil Appeals of Texas.
Tenth District. Waco.

March 28, 1946.

Rehearing Denied April 18, 1946.

**868**

C. M. Gaines and Arnold & Cozby, all of San Antonio, for appellant.

Johnson & Rogers, of San Antonio, Mann & Mann, of Laredo, and W. H. Kennon and Nat L. Hardy, both of San Antonio, for appellee.

TIREY, Justice.

Warner brought this suit against Winn to recover actual and exemplary damages for alleged slander of title to an oil and gas lease covering Share 4 of 41.66 acres of land in the Lopena Gas Field in Zapata County, Texas. On the verdict of the jury favorable to Warner, the court rendered judgment for Warner against Winn in the amount of $34,500 ($23,000 actual and $11,500 exemplary). This is the second appeal. See Tex.Civ.App., 172 S.W.2d 526, W.O.M. This cause was transferred to this court by our Supreme Court.

Appellant's first point assails the judgment against him substantially on the ground that the evidence is without dispute that Warner and Winn were engaged in a joint adventure of producing and selling gas from the Lopena Gas Field before Warner acquired a lease from Quinlan on Share 4 in said Field and that when Warner undertook to produce and market gas therefrom, an equitable right or title to two-thirds of the gas rights vested in Winn by virtue of a constructive trust and that by reason thereof he was entitled to an instructed verdict, because "one joint adventurer or partner in a joint enterprise or partnership, cannot acquire and undertake to develop a property which would be antagonistic to or in competition with the joint adventure or partnership, and exclude his co-adventurer or co-partner from an ownership therein, even though the interest which was so acquired was not within the contemplation of the parties, at the time they entered into the point adventure or partnership. When the title to such a property is acquired by a joint adventurer or partner, in his own name, a constructive trust arises by virtue of which his co-adventurer or partner is immediately vested with an equitable title therein, to the extent of his interest in the joint adventure or partnership. Joint adventurers and partners stand in a fiduciary relation with each other." The point raised is vital and requires a comprehensive statement.

On February 2, 1937, Warner, as owner, and Winn, as operator, entered into a written contract for the production and sale of gas on approximately 1570 acres in the Lopena Field, the pertinent parts of which we quote:

"That owner has this day bargained, sold, assigned, and conveyed unto operator an undivided Two-Thirds (⅔) interest in and to certain oil, gas and mineral leases covering certain lands in the County of Zapata and State of Texas, in so far as same cover all of the minerals conveyed by said leases, excepting oil and the rights therein, which are expressly excepted from said assignment and reserved in owner, and such assignment expressly including all the gas, casinghead gas or gasoline, distillage and all products therefrom, such rights, title and interests therein conveyed, being as expressly set out in said assignment executed

and acknowledged as of this date, and this agreement relating to and governing the rights of the parties in the operation, maintenance, management and control of said premises, and such assignment and this agreement together constituting the full agreement between the parties hereto, and such oil, gas, and mineral leases in which the rights, title and interests have been assigned by owner to operator are as follows: * * *

"II. Operator agrees to commence operations for the drilling of a well on one of the tracts of land hereinabove described, at a location to be agreed upon by owner and operator, within 15 days from date hereof, subject to the acceptance of title by operator, of title to Block 6, Porcion 20, and Blocks 5 and 7, Porcion 18, with tools capable of drilling to the required depth, and to continue the drilling of same, with reasonable diligence and in a workmanlike manner, to the present gas producing horizon of the gas wells now producing gas in the vicinity of such leases, which horizon is approximately 2,350 feet, and to attempt to complete such well as a producing gas well, and said well to be drilled and in the event of completion as a commercial well, to be equipped with the necessary materials and appliances commonly used in completing wells of like character in such locality, to be selected at the discretion of operator and at his own expense, free of cost to owner.

"III. Within 30 days after the said first well is completed and connected with the gas gathering lines of the purchaser of the gas in the Lopena Gas Field, and title accepted by purchaser, in which field said leases are located, or plugged and abandoned, after being drilled as hereinabove required, and after failure to complete same as a commercial well, operator will commence operations for the drilling of a second well at a location on one of the tracts hereinabove described and drill same in a like manner and to a like depth, and in the event same is completed as a commercial well, equip same at his own expense, likewise free of cost to owner.

"IV. After the completion of the first two wells, the connection there of with the gas gathering lines of the purchaser of the gas in such field, and approval of title by such purchaser, operator will commence operations on and drill in a like manner a third and fourth well at respective locations on the hereinabove described tracts of land, such operations to be commenced and such wells to be drilled by operator, when, in his judgment, the market ·demand justifies the drilling of such additional wells, and the operator's judgment to be exercised separately in regard to each well and the time for beginning drilling operations on each well to be determined separately, there being no obligation on the part of operator to drill any well after the first where any litigation or title claim interferes with the prompt payment by purchaser to operator of his proportion of the proceeds from production unless such litigation or claim arises out of some act or transaction of operator alone.

"V. All wells, in addition to the first four, as hereinabove provided in connection with the development of the minerals, in, on and under such land, excepting oil, shall be drilled by operator, or under his direction and control, at the joint expense of both operator and owner, ⅔ of such expenses to be borne by operator and ⅓ thereof by owner.

"VI. Whenever the beginning of drilling operations or drilling or other operations hereunder are delayed or interrupted by lack of water, labor or material, or by fire, storm, flood or strike, differences with workmen, or failure or inability or carriers to transport or furnish facilities for transportation as a result of any cause whatsoever beyond the control of the lessee, the time of such delay or interruptions shall not be counted against lessee, anything in this agreement to the contrary notwithstanding.

"VII. After the completion of any well or wells on the above described land and premises, it shall belong jointly to the owner and operator under the terms of this agreement, and the assignment of such interest in such leases to operator, all expenses in connection with the maintenance and operation thereof in connection with the land and premises owned jointly by owner and operator, except the drilling and completing·of the first four wells, as herein provided for, shall be borne by operator and owner in the proportion of ⅔ to operator and ⅓ to owner.

"VIII. The net profits derived from any wells completed on such premises owned jointly by the parties hereto under this agreement, after first deducting the expenses in connection with the maintenance and operation thereof and of the leasehold premises other than the costs of

drilling and completing the first four wells, shall be divided between the owner and the operator in the proportion of ¾ to operator, and ¼ to owner, until the costs and expenses of drilling and completing any or all of said first four wells, as herein provided, shall have been returned to operator, and after operator has been so repaid for all of the said wells drilled up to four, at his own cost and expense, under the terms hereof, such net profits shall be divided so that operator shall receive ⅔ thereof and owner ⅓.

*   *   *   *   *   *

"X. In the event operator should drill any well on such premises and be unable to complete such well as a well producing any of the minerals in which operator has any interest hereunder, and there is found in such well sands or horizons in which a well may be completed producing oil, then operator shall immediately before abandonment thereof notify owner at the address which owner has furnished to operator, and owner shall have the right to complete or have said well completed as an oil well, at his own cost and expense, as herein provided, and shall have the use of the rigs, tools, and equipment thereon, if belonging to operator, at the usual and customary rate, and under the usual terms prevailing in such locality, and in the event such well is being drilled by an independent contractor, shall have the rights of operator under such contract for the completion of such well, at owner's own cost and expense, and in the event such well is so taken over, the cost and expense to be repaid to operator in connection therewith shall be the cost and expense to operator to the date same is taken over by owner, and further providing, however, that in the event the circumstances in connection with such well are such that the owner cannot take same over and complete it, if he so elects, then operator may complete or cause same to be completed for the use and benefit of owner, under his direction, and in the event same is being drilled by an independent contractor, this· shall be subject to the terms of the contract between operator and such contractor, and operator shall have the right to determine whether or not owner shall take over such well and complete it or operator shall complete it or cause it to be completed, and if completed by operator, then to be delivered and paid for by owner as provided in paragraph XII hereof relating to completed wells.

"XI. In the event owner shall drill a well for the discovery and production of oil under the sole rights retained by him in the oil under such premises, and be unable to complete a well producing oil, but should encounter sands or horizons capable of producing any of the minerals in which rights therein may have been assigned under the terms of this agreement and the assignment in connection therewith to operator, he shall notify operator in like manner as provided in the preceding paragraph for notice from operator to owner, and operator shall have the same rights and privileges in connection with such well as provided for owner in such preceding paragraph.

"XII. In the event operator shall complete a well producing oil in paying quantities on such premises, he shall immediately notify owner at his address, as furnished to operator, and owner shall immediately take same over, operator surrendering possession and control to him, and owner shall repay to operator the costs of drilling, completing and equipping said well as drilled, plus an additional sum of· Ten Per Cent on such costs, and operator shall receive the proceeds from the production thereof until such sum has been repaid, and unless such well is separately connected to a pipe line so that the actual production taken therefrom may be guaged, it shall be presumed to be a producing well, producing its full allowable, unless the actual production therefrom can be definitely determined to be less, and the proceeds therefrom shall be "determined on such basis, and likewise should owner drill and complete any well on such premises producing any of the minerals other than oil, operator shall likewise be notified by owner, and shall take possession thereof, which shall be immediately surrendered to him by owner, paying to owner Two-Thirds (⅔) of the costs of drilling, completing and equipping same, plus an additional amount of Ten Per Cent on such sum, and owner shall receive the proceeds from production therefor until he has been repaid out of operator's interest such Two-Thirds (⅔) of such costs, plus Ten Per Cent, such well to be separately metered.

"XIII. In drilling and other operations conducted on the premises by owner or operator in connection with their respective rights, each shall so conduct his operations as not to interfere with the wells of the other or the operation thereof.

"XIV. So long as the oil-gas ratio as may be from time to time fixed by.the Railroad Commission of the State of Texas is not exceeded, owner shall be permittted to produce oil from any oil wells on said premises, and operator shall have no interest in such wells or the production therefrom.

"XV. Both operator and owner shall have access to all drilling records, samples of cuts, cores, and all other information in reference to the drilling of said wells.

"XVI. All taxes and lease rentals shall be paid by the parties hereto in the proportion of Two-thirds (2/3) by operator and one-third (1/3) by owner, the ad valorum taxes however, to be paid, being such as may be assessed and levied against the leasehold interests in such properties in which operator has been assigned an interest under the assignment herein referred to in this agreement.

"XVII. Operator shall carry employers liability and public liability insurance, which charge shall be taxed as part of the costs and shall inure to the benefit of both parties, excepting that where drilling or other operations are being conducted by contract with an independent contractor, such independent contractor shall be required to carry such insurance in lieu of operator and all operations by either party on the premises shall be in compliance with all of the rules and regulations of the Railroad Commission of the State of Texas, and such other governing bodies as may have control.

"XVIII. Operator shall have exclusive management and control of and in connection with the premises and in the development, maintenance, operation and marketing of the production from such leases, in so far as all minerals excepting oil are concerned, and as reserved by owner herein, and operator shall render a monthly statement to owner mailed on or before the 15th day of each month, showing the costs and expenses in connection with the operation and development thereof, in so far as he is able, and the owner shall, within Ten (10) days thereafter, and on or before the 25th day of each such month, remit to operator his proportion of such costs and expenses as payable under the terms of this contract, and not otherwise provided for herein, and in this connection, no overhead, bookkeeping or general charges shall be made as part of the costs of operation, and no salary charged for operator except-ing that operator shall be entitled to and shall receive actual cost of such latter items not to exceed an average for each year of Fifty ($50.00) Dollars per month for each and every well on such premises, excepting oil wells, to cover costs and expenses, One-third (1/3) of which shall be borne by and paid by owner to operator monthly, and the remaining Two-thirds (2/3) being operators portion of such charge. The expense for labor shall be limited to the necessary labor actually performed on the lease by employees or immediately in connection therewith.

"XIX. Operator, in addition to the statutory liens, shall have a lien upon the owners interest in such jointly owned premises to cover any amounts due operator under the terms hereof, and shall likewise have a lien upon any oil well and the casing and equipment therein or on or in connection therewith to secure the repayment of any sum due operator by owner in connection with said well, as herein provided, and owner shall likewise have a lien upon any other well, casing and equipment thereon or in connection therewith drilled by him and delivered to operator to secure the payment of any sums due by operator to owner under the terms hereof.

"XX. Purchasers of the gas and other products from such leasehold interest jointly owned, shall remit directly to the owner and operator, as their respective interests may appeal, their pro-rata parts of the proceeds from the sale of such production.

"XXI. Owner shall deliver to operator Abstract of Title immediately, covering Block 6, Porcion 20, to date, and Supplemental Abstract of Title covering Blocks 5 and 7, Porcion 18, as agreed, and operator shall immediately after delivery, accept or reject title thereto, and in event of acceptance, proceed with drilling operations as hereinbefore provided, and not later than 15 days from date hereof, if title to said tracts is not approved and drilling operations are not begun within said period of 15 days, then this agreement shall terminate as to both parties, and, if accepted, the owner shall further deliver the Abstracts of Title covering the other above tracts as soon as possible, and the operator shall have a reasonable time in which to have same examined, and the opinion of his attorneys submitted, showing the defects in or objections to such title, and if any such appear, owner shall cure such defects and objections in a reasonable time, and there

shall be no obligations on the part of operator in connection with other tracts, until such defects or objections shall be cured, provided if title to said other tracts is not accepted within 60 days after delivery of Abstracts, the tracts not so accepted shall be released from the agreement by operator, but not from the assignment.

"XXII. Each party hereto shall furnish to the other party in writing, his present address, and such addresses shall govern the parties in regard to all notices to be sent, until, in the event of any change of address of either party, the other party has been notified in writing delivered to his address."

The oil and gas lease (a renewal and extension) here in question was executed by C. P. Quinlan to Warner on May 8, 1939 and went into effect on June 15, 1939 and, among other things, provided that unless production was had or drilling operations begun by June 15, 1940, the lease would lapse. No drilling operations were begun and the lease lapsed by operation of law on June 15, 1940. The affidavit by Winn which caused the lease to lapse was executed on January 31, 1940, and was filed for record in Zapata County on February 1, 1940, and the pertinent parts of that affidavit are: "That he is the same Wm. H. Winn who made and entered into a certain agreement dated February 2, 1937, with Thor Warner, relating to certain oil, gas and mineral leases covering lands out of Porciones 18, 19, 20 and 21 in Zapata County, Texas, whereby the said Wm. H. Winn acquired an undivided two thirds (2/3) interest in the gas rights in such oil, gas and mineral leases as therein set out, and the said Thor Warner as part of such agreement and as part of the consideration to Wm. H. Winn agreed to assign an undivided two-thirds (2/3) interest in such leases covering such gas rights, such agreement being made and entered into with the understanding and agreement on the part of both parties that such interest would be assigned in all of the leases held or owned by the said Thor Warner in such Porciones. That subsequently by certain assignments in accordance therewith, such interests were assigned in certain leases to Wm. H. Winn, and the said Wm. H. Winn assigned an undivided one-third (1/3) interest in a lease acquired by him from a different source to Thor Warner under said agreement and the understanding that he was acquiring such two thirds (2/3) interest in such gas rights in all of said leases from Thor Warner, and that under and by virtue of the agreement and understanding between Thor Warner and Wm. H. Winn, the said Wm. H. Winn is entitled to an assignment of such two-thirds (2/3) interest in the gas rights and in any remaining leases held by Thor Warner and not heretofore assigned to Wm. H. Winn. That this affiant does not have full knowledge of the lease so held and owned by Thor Warner, but in addition to the leases assigned, no interest in the following described leases has been assigned to Wm. H. Winn, and he is entitled to an assignment of such two-thirds (2/3) interest in the gas rights therein, such leases being: 'The leasehold interests of Thor Warner in Share 3, 4 and 5, Porcion 19, in such County in the vicinity of the other leases.' "

Defendant Winn seasonably carried forward the drilling operations imposed upon him by virtue of the contract of 1937 with Warner and drilled four wells which produced gas (three on the property covered by the contract and one on Winn's property which he conveyed to the joint adventure). Warner and Winn (as sellers) seasonably executed two gas purchase contracts with Nordan and Morris (as buyers) for the sale of gas, and the gas contracts show that they were executed for the benefit of Warner and Winn, and likewise disclose obligations to be carried by Warner and Winn, and for which they were jointly responsible in the sale of gas to the purchaser. One of the provisions provided: "Buyer shall not be under any obligation to take all or any specified proportion of the gas that can be produced from the above described premises during any defined or specified time; but Buyer shall endeavor to take gas from the herein described lands and leaseholds in the same equitable or ratable proportion that it takes gas from lands and leaseholds which it now owns or shall hereafter own, and from the lands and leaseholds of others from whom Buyer is now purchasing and/or may hereafter purchase gas in the gas field in which said premises of Seller are located." Evidence was tendered by virtue of certificates from the Railroad Commissioner showing large quantities of gas were produced continuously from the Winn-Warner wells in the Lopena Field during each year from 1937 to 1945, inclusive. In compliance with the contract of 1937, Winn and Warner contributed to the cost of de-

velopment, to the lease expenses, and both have enjoyed the profits in proportion to their respective interests in said enterprise. Winn, in his pleadings, among other things, alleged that a partnership existed between him and Warner to produce and sell gas from the Lopena Gas Field, and this allegation of partnership was not denied by a verified pleading as required by Rule 93, Texas Rules of Civil Procedure. See also Art. 2010, Rev.Civ.Stats. The Quinlan lease was undeveloped in that it had no well thereon at the time the affidavit was filed. Warner testified to the effect that such lease was on top of the structure within the Lopena Gas Field; that the area of such field was approximately 2900 acres; that the Quinlan lease was within such area; that the map of the field disclosed that it gradually rises in a dome shape, and that the well drilled on Share 4, after he lost same, is near the apex of that gas dome. After Warner acquired the renewal of the Quinlan lease, he undertook to appropriate such lease to his own benefit and exclude Winn from any participation therein, and to that end he entered into a contract with driller Staggs, which contract, among other things, provided that Staggs would begin the drilling of a well by February 10, 1940 on the Quinlan lease for the production of gas. For the drilling of this well Staggs was to receive one-half of the working interest of 7/8 and Warner was to receive the balance of the working interest, and Warner was also to furnish the casing and tubing for the well. Thereafter Warner and Staggs went to the Quinlan lease and designated where the well should be drilled and the drilling site was cleared so that the well could be started. Staggs refused to drill the well because of Winn's affidavit; Warner was financially unable to drill the well, nor could he get anyone else to drill the well because of said affidavit; and Quinlan refused to grant him further extension of the lease. Warner lost the lease due to the fact that no drilling operations were commenced by June 14, 1940. Thereafter Staggs drilled a well on the Quinlan lease for Thompson, who obtained the lease after Warner lost it, and this well drilled by Staggs was designated as the C. P. Quinlan No. 1 Gas Well, and evidence was tendered in the nature of certificates from the Railroad Commissioner showing production of gas from the well for the month of December, 1940, and for every month thereafter down to and including March, 1945. A computation showed that from the time the well was drilled until the time of the trial it had produced an aggregate of $69,896 worth of gas. The computation further indicated that if such well had been drilled for Warner under his contract with Staggs that Warner's share from such well would have aggregated $19,300 up to the time of the trial, and there was evidence that the well was not yet exhausted but would continue to produce indefinitely in the future. It is without dispute that there was only one purchaser for the gas produced from the Lopena Gas Field, and that such gas was sold for use in Monterrey, Mexico, and that from February 2, 1937, down to June 10, 1940, when the Quinlan lease was lost by the plaintiff, the wells belonging to the plaintiff and defendant could market only a small percentage of the gas that they were capable of producing. We quote in part the testimony of Warner in reference to this matter:

"Q. Now, from February 2, 1937, down to June 15, 1940, you have never sold all the gas that your wells could have produced had they been turned completely loose? A. No, only a small percentage.

"Q. In other words the wells during the period of time from February 2, 1937, down to June 15, 1940, have only been able to sell a portion of the gas that they would really have been capable of producing if they could have found a purchaser for the whole business? A. Yes, sir.

"Q. Can you give me an estimate of what percentage of your production was sold and what was not sold? A. I cannot give it to you during that period of time. But at no time has the market been able to absorb the daily potential of the Lopena Field. And today we are selling from twenty-five to thirty million a day and we could probably sell even today twice that amount.

"Q. You say sell. You mean produce that amount? A. I mean produce. * * *

"Q. Since February 2, 1937, even down to this date the wells from the Lopena Field that were producing had to be cut back and not take all the gas that was available that the wells could produce, because the market would not absorb it, is that correct? A. That is correct."

Warner testified further to the effect that Nordan and Morris were connected with the United Gas Pipe line; that such company connects with the national system of

the United Gas Company, which takes gas as far north as Montana and east as far as Albany.

It is without dispute that Nordan and Morris, the purchasers of the gas, prorated the gas which they were willing to purchase from those wells producing gas in the Lopena Gas Field on the basis of the number of wells; that is to say, the quantity of gas which the purchaser was willing to purchase was divided by the number of wells in the Lopena Gas Field from which gas was being produced, and each well was allowed to supply the same proportion of the gas purchased. We quote again from Warner's testimony:

"Q. Then if there were ten wells in the field each well would be privileged to sell Nordan and Morris 1/10th of the gas that Nordan and Morris was willing to purchase? A. Yes, sir.

"Q. So if ten more wells were drilled, making twenty in all, under that proration then each well would be able to supply to Nordan and Morris only 1/20th of the gas Nordan and Morris wanted to buy? I am using that just illustrating the method, is that correct? A. That is right.

"Q. You knew then, in January, 1940, that when you undertook to drill a well on Share 4 under a contract with Staggs, or if you actually produced a gas well and sold the gas to Nordan and Morris on the available market it would add one more gas well? A. Oh, yes.

"Q. To the Lopena Field? A. Yes, sir.

"Q. And to that extent would reduce the quantity of gas that could be sold from the wells to its pro rata extent, it would reduce the quantity of gas that could be sold from the wells jointly owned by you and Winn? A. That is correct.

"Q. You were getting one-third of the gas under your business arrangement with Winn, but you were getting one-half of the gas under your arrangement with Staggs? A. That is right.

"Q. So it was to your benefit to drill additional wells on Share 4 rather than put them into the particular deal that you had under the agreement of February 2, 1937? A. Yes. The difference between a third and a half.

"Q. And to that extent it would be detrimental to Mr. Winn, wouldn't it. A. Well, I don't know just how Mr. Winn feels about people who have properties of their own."

It is without dispute that the production and sale of gas from Share 4 (Quinlan lease) was antagonistic to and in competition with the joint adventure. Warner's testimony shows that the total amount of gas that the wells in the Lopena Gas Field were capable of producing exceeded the quantity of gas that could be sold on the only available market, and as the gas purchased was divided according to the number of wells, the production of gas from a well on the Quinlan lease would be in competition with the four wells which were at that time producing gas for the joint adventure.

Warner further testified, in part, with reference to Exhibit 17, which he tendered in evidence and which was a map that showed the cross-section of the Lopena Gas Field and which map also shows a dome-shaped structure:

"A. The structure takes on an arched condition, which makes it possible for the accumulation of the gas. It is what we term a geological structural trap. Without that conformation there would be no accumulation available for commercial production.

"Q. Is it more advantageous or less advantageous to be high on the structure? A. More advantageous.

"Q. Why is that? A. Because of the peculiarity of the gas in that it seeks highest known point to which it can migrate and lodge itself. It is just the opposite of water, which seeks the lowest possible place to accumulate.

"Q. Gas rises? A. Gas rises to the highest point."

Exhibit 17 shows that the Quinlan well on Share 4 is near the top of that dome and is apparently 1707 feet below the sea level and that next to that particular well, on the right, is one of the partnership wells of Warner and Winn, known as the Warner-Winn-Ramirez, which is 1733 feet below sea level and is producing from the same gas sand. Plaintiff further testified to the effect that he contemplated drilling the Staggs well on Share 4 to sand No. 3 and that the contract with Staggs contemplated that sand No. 3 should be the sand to which the well should be drilled and that the well Staggs finally drilled for Thompson, after Warner lost the lease, was drilled to this sand No. 3.

Plaintiff's testimony also showed that Quinlan Well No. 1 produced gas every month from the month of December 1940 down to the date of the trial, and testimony was likewise to the effect that the total amount of gas produced from this well, less meter correction and royalty, aggregated $46,601.

Plaintiff also testified to the effect that Sand No. 3, from which gas was produced from Quinlan Well No. 1, extends all over the Lopena Field like a blanket; that the four Warner-Winn wells belonging to the joint adventure were producing gas from this same sand No. 3; that these wells were producing during the years 1939-40; that the effect of the production of gas from a well in the Lopena Gas Field was to lower the gas pressure and the amount that the gas pressure is lowered depends on the amount of gas taken out; that the withdrawal of gas from the Lopena Field reduced gas pressure about sixty pounds from February 2, 1937, the date of the contract between plaintiff and defendant, to June 15, 1940, the date when plaintiff lost the lease on Share 4; that from 1940 to December, 1944, the pressure went down more than 200 pounds; that the distance between Share 4, covered by the Quinlan lease, and the lease owned by the joint adventure of plaintiff and defendant, known as the Winn-Warner-Ramirez lease, is 900 feet. Plaintiff tendered in evidence the contour map of the Lopena Gas Field, and this map shows the location in blue of Share 4 and shows contour line showing the very top of the circle marked 1700 and shows the outside boundaries of the Lopena Field by the dotted lines between the lines 1800 and 1850. This map shows the location of the Winn-Warner wells on the property belonging to their joint adventure. The map also shows that lying immediately west of Share 4 are two tracts marked Winn-Warner, one with a well thereon, aggregating 108.2 acres, and no land lies between these two tracts and said Share 4, except a narrow strip of ground designated on the map with a large 3, which the plaintiff testified was 900 feet wide.

■■■ We think it is well settled that: " 'Where persons engage in a common enterprise by way of joint adventure, each has a right to demand and expect from his associates the utmost good faith in all that relates to their common interests. Within the scope of the enterprise they stand in a fiduciary relation each to the other, and are bound by the same standards of good conduct and square dealing as are required between partners. This obligation begins with the opening of the negotiations for the formation of the syndicate, applies to every phase of the business which is undertaken, and continues until the enterprise has been completely wound up and terminated. No member in promoting or carrying on the common enterprise can lawfully obtain for himself any secret profit or advantage therefrom, nor can he, without the consent of his associates, engage in any individual operations harmful to the business ·in which he and his associates are engaged or acquire any interest in the property employed in the venture antagonistic to the interest which they have in it.' 33 C.J. par. 36, pp. 851, 852. 'Until the adventure has terminated or the enterprise has been abandoned a joint adventurer cannot exclude his associates from an interest in the property by purchasing· it for his individual account, nor can he acquire for his individual benefit an interest therein antagonistic to the interest which he acquires for his associates, even though the interest which he acquired individually was not such as was within the contemplation of the parties at the time they entered into the joint adventure.' 33 C.J. par. 48, pp. 855, 856." Whatley v. Cato Oil Co., Tex. Civ.App., 115 S.W.2d 1205, 1209, and for collation of authorities. See also 62 A.L. R. 13, note "c" on page 24. (For latest expression of the Supreme Court see Binford v. Snyder, Tex.Sup., 189 S.W.2d 471, point 2, p. 472.)

■■■ Warner and Winn were engaged in the joint enterprise of producing and selling gas from the Lopena Field, and it is clear that within the scope of such enterprise they stood in a fiduciary relation, each to the other. The exact question presented here for our decision is, Did such fiduciary relation constitute the basis for the application of the doctrine of constructive trust to the Quinlan lease? Since we are of the opinion that it did and that Winn's motion for peremptory instruction should have been granted, " * * * it is our duty to disregard all conflicts in the testimony; to consider the evidence adduced in the case in the light most favorable to plaintiff, and to indulge in his favor every intendment reasonably deducible from the evidence. * * * When the facts are controverted, or such that different inferences may be reasonably drawn

therefrom, an issue of fact is raised; it is only when the evidence is harmonious and consistent, and the circumstances permit of but one conclusion, that the question becomes one of law for the determination of the court." James v. Missouri-Kansas-Texas R. Co., Tex.Civ.App., 182 S.W.2d 921, points 1-2, p. 922 (writ refused). Many of the material facts have already been stated. We think it is pertinent here to say that Warner further testified in part:

"Q. Mr. Warner, I will ask you if you ever had any previous agreement, orally or otherwise, to transfer to Mr. Winn any interest in Share 4, Porcion 19 in Zapata County, Texas? A. No, sir.

"Q. At the time of these negotiations in the summer of 1936 did you have any map or plat, an ownership map or plat, showing the ownership of various leases in that area? A. Yes, sir.

"Q. Did you at that time have a lease on this Share 4, Porcion 19? A. Yes, sir.

"Q. Did you show that map to Mr. Winn? A. Mr. Winn saw all of the maps I had on the Lopena area at the time he came to me the first time, about July, 1936. And from that time on until the deal was closed we discussed the deal, and I do not recollect whether there was any further display of maps or not until we made the deed.

"Q. Did that map which you say you showed Mr. Winn show that you had ownership of this Share 4?

\* \* \* \* \*

"A. Oh, yes. All the maps I had at the time were the available maps of that period. They changed from time to time as ownerships changed.

\* \* \* \* \*

"Q. I will ask you if at any time you had any agreement, either written or oral, with Mr. William H. Winn, to convey or give him any share or interest in Share 4, Porcion 19, in Zapata County, Texas? A. I never at any time had any agreement with Mr. Winn in reference to share 4."

\* \* \* \* \*

"Q. Now, along in November, 1937, I will ask you if you made any character of exchange of properties with Mr. Winn? A. Yes, sir.

"Q. I show you Plaintiff's Exhibit No. 7, which is a photostatic copy of an agreement dated November 19, 1937, purporting to be signed by Thor Warner and William H. Winn. Is that the exchange of properties agreements that you had with him? A. Yes, sir, it is known as the swap deal.

"Q. That is what you call it, the swap deal? A. Yes, sir.

"Q. I also show you two instruments, one of them is Plaintiff's Exhibit No. 6, executed by William H. Winn, dated November 19, 1937, and another one dated the same date, signed by you. I will ask you if those two instruments represent the transfers that you executed in compliance with this agreement here? A. Those are the two documents completing the swap deal.

"Q. How many acres were involved in the lease you transferred to Mr. Winn? A. Fifty-three and one-half acres.

"Q. What interest did you convey to him in that fifty-three and one-half acres you had? A. Two-thirds interest in the gas.

"Q. What interest did he convey to you in the lease he had. A. One-third interest.

"Q. In the gas? A. In the gas.

"Q. What was the condition of your lease in reference to whether it did or did not have a well on it? A. My lease was undeveloped.

"Q. It was a commercial lease? A. Yes, sir.

"Q. For what period? A. It had a ten year life commencing in 1933.

\* \* \* \* \*

"Q. What was the condition of the lease you received from Mr. Winn? A. Mr. Winn had drilled a well on it. It was his own property, wherein he owned both the oil and the gas rights.

"Q. That provides that those leases shall be operated under the operating agreement of February 2, 1937? A. Yes sir.

"Q. Now, in February, 1937, had you at that time entered into any agreement with Mr. Winn to make in the future this swap agreement that you did afterwards make? A. No, sir.

"Q. Now, this Quinlan lease that you had on Share 4, Porcion 19, I believe that lease provided that it should expire by June 15, 1940, unless there was a well drilled and production on it, didn't it? A. Yes sir.

"Q. I believe it said that if no well for gas was drilled and producing on said land on or before the 15th day of June,

1940, that lease was to terminate as to both parties? A. Yes, sir.

\* \* \* \* \*

"Q. Were you there looking after the interests of yourself and Mr. Winn at times when he was not there? A. Well, I was looking after the interests of the property, yes.

"Q. You were looking after your interests and Mr. Winn's interests at certain times when Mr. Winn was away? A. No. I represented myself and not Mr. Winn. Mr. Winn was there most of the time. And I was absent too. \* \* \* "

Warner and Winn determined the location of each of the four wells drilled by the joint adventure.

"Q. Now, at that time the entire lease was in the name of Mr. Winn, wasn't it? A. When we selected the location?

"Q. I mean the permit to drill it? A. I believe so.

"Q. You contemplated getting your one-third of the gas interest in it? A. I presume so.

"Q. And your one-third of the gas interest in that was assigned to you by Mr. Winn on November 19, 1937? A. That is what we call the swap deal.

\* \* \* \* \*

"Q. And where was his fifty-three acres? A. Right there (indicating).

"Q. Now, this is the fifty-three acres (indicating)? A. Yes. They are both fifty-four acres, Mr. Arnold, to get it correct. Mr. Winn purchased this later on (indicating), and he had purchased this from another source. And I gave Mr. Winn two-thirds interest in an undeveloped lease for a one-third interest in a lease with a well on it. (Each of the instruments referred to was dated November 19, 1937.)

\* \* \* \* \*

"Q. Well, you made a lease on Share 4 from Quinlan for approximately $10.00 an acre? A. In 1933.

"Q. I am talking about this new lease that you got along in 1939? A. That is a part of the old lease.

"Q. How much did you pay for it? A. I think Mr. Quinlan gave me that extension without payment, one year's extension to drill the well, and I was moving in to drill that well when this false affidavit of your client was filed.

"Q. Let's get back to the question of the deal about Share 4. At the time you made this contract with Mr. Winn in February, 1937, did you have a lease on Share 4 from anybody? A. Yes, sir. (Winn had no interest in the Lopena Field prior to his contract of February, 1937 with Warner. Warner had no working interest in any well in the Lopena Field before February 2, 1937. He did own some royalty.)"

■■ Can we apply the old established rule set out in Whatley v. Cato Oil Co., supra, to the undisputed factual situation that existed between Warner and Winn? We think so. First of all, Warner and Winn, under their contract, were engaged in the common enterprise of producing and selling gas by way of joint adventure, and each had the right to demand and expect from each other the utmost good faith in all that related to their common interest. Within the scope of the enterprise of producing and selling gas from the Lopena Field they stood in a fiduciary relation to each other and they were bound by the same standards of good conduct and square dealing as partners. That Winn and Warner each recognized the nature of their obligations to each other is clearly evidenced without dispute by what Warner termed the "swap deal." Here we find that on November 19, 1937, Winn transferred 54 acres into the joint enterprise on which he had a producing well, and Warner on the same day transferred 54 acres of undeveloped acreage to the common enterprise, and the rights of both parties, under such transfers, were vested as provided by the contract of February 2, 1937. Under Warner's testimony, which we must assume is true, he had some sort of interest in the Quinlan lease before the contract of February 2, 1937 was executed, but under the foregoing rule he could not renew such lease for his individual benefit for the purpose of obtaining a secret profit or advantage therefrom without the consent of Winn, because it is without dispute that the production and sale of gas from such lease was antagonistic to and in competition with their joint enterprise. We think it is singular that paragraph IV of the contract of February 2, 1937 provides in part: "After the completion of the first two wells \* \* \* operator will commence operations on and drill in a like manner a third and fourth well at respective locations on the hereinabove described tracts of land, such operations to be commenced and such wells to be drilled by operator

when, in his judgment, the market demand justifies the drilling of such additional wells, and the operator's judgment to be exercised separately in regard to each well and the time for beginning drilling operations on each well to be determined separately * * *." Until the joint adventure between Warner and Winn had been abandoned, Warner could not exclude Winn from any interest in the Quinlan lease antagonistic to the contract of 1937. "It is well settled that an agent or other person sustaining a fiduciary relation to another cannot deal on his own account with the subject-matter of that relationship, or acquire an interest therein adverse to the one whom he represents, or make use of the knowledge which he acquires in the course of such agency or fiduciary relationship for his own benefit and to the injury of the trust; and that upon so dealing, he will be held, in equity, as a trustee of the person represented and compelled to transfer to him the property and benefits which he has thus obtained." Maas v. Lonstorf, 6 Cir., 194 F. 577, point p. 584 and for authorities collated.

But appellee contends that such rule is not applicable to the factual situation here because the contract between Warner and Winn of February, 1937, among other things, provided: "* * * and this agreement relating to and governing the rights of the parties in the operation, maintenance, management and control of said premises, and such assignment and this agreement together constituting the full agreement between the parties hereto * * *"; and that in addition thereto Winn testified in part: "Q. * * * Did you know that contract and this agreement related to and governed the rights of the parties and the operation, maintenance and management and control of said properties, and the lease assignments and this agreement together constituted the full agreement between the parties hereto? You knew that contract had that language in it, didn't you? A. Yes, that was the full written agreement." We overrule this contention. Here the evidence is without dispute that the relation of trust and confidence did exist between Warner and Winn by virtue of their joint adventure and we think that the undisputed record brings this cause within the general rule hereinabove quoted. Much has been written about actions arising under fiduciary relations growing out of joint adventures and partnerships, but it seems that there is substantially no distinction in the application of the rules relating to joint adventures and partnerships that have come down to us through the crucibles of time. Our Supreme Court makes no distinction. See Thompson v. Duncan, Tex.Com.App., 44 S.W.2d 904, and Johnson v. Peckham, 132 Tex. 148, 120 S.W.2d 786, 120 A.L.R. 720. We believe that the best expressions of our Supreme Court more nearly applicable to the factual situation here are found in Johnson v. Peckham, supra, and McDonald v. Follett, 142 Tex. 616, 180 S.W.2d 334. In Johnson v. Peckham, supra, which deals with the sale of partnership property based on negotiations made prior to the time one partner acquired the interest of his copartner and sold the property at a greater value than was placed upon it when such partner purchased such copartner's interest, our Supreme Court said the general rule announced in 20 R.C.L. 879 was applicable to that situation. It is: "'* * * Since each is the confidential agent of the other, each has a right to know all that the others know, and each is required to make full disclosure of all material facts within his knowledge in any way relating to the partnership affairs.'" [132 Tex. 148, 120 S.W.2d 787.] Again, in the same case our Supreme Court said: "When persons enter into fiduciary relations each consents, as a matter of law, to have his conduct towards the other measured by the standards of the finer loyalties exacted by courts of equity. That is a sound rule and should not be whittled down by exceptions." (Italics ours.) There is no reason given as to why Warner defaulted in the duty and obligation he owed to Winn, save and except Warner's own statement to the effect that he obtained a better contract with Staggs than he had with Winn. He was to get one-half of the profits from Staggs, whereas he got only one-third from Winn. We think that the statement of the rule by Mr. Justice Cardozo in Mcinhard v. Salmon, 249 N.Y. 458, 164 N.E. 545, 546, 62 A.L.R. 1, is peculiarly applicable to the fiduciary relationship existing between Warner and Winn. "Joint adventurers, like copartners, owe to one another, while the enterprise continues, the duty of the finest loyalty. Many forms of conduct permissible in a workaday world for those acting at arm's length, are forbidden to those bound by fiduciary

ties. A trustee is held to something stricter than the morals of the market place. Not honesty alone, but the punctilio of an honor the most sensitive, is then the standard of behavior. As to this there has developed a tradition that is unbending and inveterate. Uncompromising rigidity has been the attitude of courts of equity when petitioned to undermine the rule of undivided loyalty by the 'disintegrating erosion' of particular exceptions. * * * Only thus has the level of conduct for fiduciaries been kept ?^ ?. level higher than that trodden by th^ ^rowd. It will not consciously be lowered by any judgment of this court." The above rule was quoted with approval by our Supreme Court in Johnson v. Peckham, supra.

In McDonald v. Follett, supra, the court said [142 Tex. 616, 180 S.W.2d 337]: "No rules can be prescribed and no attempt should be made to formulate rules for the measurement of conduct by courts of equity, but that such conduct must be measured by standards exacting the utmost fidelity between the parties is universally recognized. * * * In Pomeroy's Equity Jurisprudence, 4th Ed., Vol. 3, § 1050, will be found a very careful statement of the law, with citation of many authorities, on the question of renewal of leases by partners and other fiduciary persons. After announcing the general rule that one member of a partnership cannot, during the existence of a lease, take a renewal thereof for his own benefit to the exclusion of his fellows, but that a lease so taken inures to the benefit of the whole firm, it is stated that the rule is: ' * * * a particular application of a broad principle of equity, extending to all actual and quasi trustees, that a trustee, or person clothed with a fiduciary character, shall not be permitted to use his position or functions so as to obtain for himself any advantage or profit inconsistent with his supreme duty to his beneficiary.' " Our view is that when Warner took a renewal of the Quinlan lease and attempted to appropriate it to his own use and benefit and to the detriment of his coadventurer Winn, he grossly violated the duty and obligation he owed to Winn. It is our opinion that the affidavit by Winn did not slander Warner's title to the Quinlan lease and that Warner has no claim against Winn.

But appellee contends that "no joint adventure ever existed between the plaintiff and the defendant which in any manner affected the title to said Share 4", and says,

in effect, that such question was involved in the former appeal of this case (see Winn v. Warner, supra) and that the holding of the Honorable Fourth Court of Civil Appeals became the law of the case. We have examined the record on the first appeal and find that Winn based his defense on a verbal agreement between himself and Warner. Winn's answer on the first trial, among other things averred: "3rd. On or about the fall of 1936 or January, 1937, the plaintiff and defendant entered into a verbal agreement, which brought into existence a joint enterprise, which verbal agreement was substantially as follows: * * *." Then follow Sections a, b, c, d, e, f, g, h, i, j and k, which specifically allege in detail the contents of such verbal agreement. Then defendant averred:

"4th. After the plaintiff and defendant entered into said verbal agreement which brought into existence said joint enterprise, the plaintiff and the defendant entered into a written agreement dated February 2, 1937, which was the agreement hereinabove referred to as subdivision k of the foregoing paragraph 3rd, and which agreement was intended to apply to the particular lands described therein, and in addition, the provisions contained therein were to be extended to apply and to be the same provisions as would apply to all other mineral, except oil, and gas rights at that time owned by the plaintiff in Lopena Field, whether in his own name or in the name of anyone else, and intended to apply to the gas and mineral rights, except oil, in all defective leases when cleared of defects, and intended to apply to all future leases which might be obtained in the Lopena Field by either the plaintiff or the defendant.

"5th. In the carrying out of the said joint enterprise, brought into existence by the said verbal agreement, not to supersede the verbal agreement but in carrying same out, the following instruments were executed and came into existence: (a) the said instrument hereinabove described, dated February 2, 1937. * * *"

Winn further averred: "8th. The defendant alleges that by virtue of the said joint enterprise and the facts alleged in this petition, that whatever title the plaintiff acquired in the gas rights in the 41.66 acres of land hereinabove described in paragraph 1st was acquired by the plaintiff in trust for the joint enterprise and for the joint ownership of the plaintiff and the defendant, in accordance with the said joint enterprise,

and that by virtue of the said joint enterprise and the facts alleged in this pleading, that the defendant became the owner of an undivided two-thirds of whatever gas rights may have been owned or acquired by the plaintiff in or to the said 41.66 acres of land hereinabove described."

On the second trial (the case before us) Winn filed and went to trial on his third amended original answer. The fifth paragraph thereof provides: "In the spring of 1937, the plaintiff and the defendant agreed that they would become associated together and engage in a business enterprise to produce and market, for their mutual profit, gas from the Lopena Gas Field, from and under the Oil and Gas Leases owned by and in the name of plaintiff, including certain leases in the name of J. E. Johnson, which belonged to or were under the control of plaintiff. In the carrying forward of the said business enterprise, two wells were to be drilled, to a depth of approximately 2350 feet, more or less, to the gas producing horizon believed to exist at approximately that depth, and that after the completion of the first two wells that a third and fourth well would be drilled, in the event, in the judgment of the defendant the market demand justified the drilling of such additional wells. The money necessary for the drilling and completion of the first four wells was to be furnished by the defendant, and any wells drilled after the first four wells were to be drilled by the defendant or under his direction, at the joint expense of the plaintiff and the defendant; the plaintiff to pay one-third thereof and the defendant two-thirds thereof. The expense of maintenance and operation of the wells was to be paid, one-third by the plaintiff and two-thirds by the defendant. The net profits growing out of the said business enterprise, from any wells completed, after deducting the expense of maintenance and operation, was to be divided, three-fourths to the defendant and one-fourth to the plaintiff, until the defendant had been reimbursed for the cost of the drilling and completion of the first four wells, and thereafter, such net profits were to be divided, two-thirds to the defendant and one-third to the plaintiff. In addition to the division of the net profits, the defendant was to own and have vested in him the titles to two-thirds of the gas and minerals in the leases coming under the said business enterprise, while the plaintiff was to own the oil and the remaining one-third. *By*

*reason of and growing out of the said business enterprise, and of the agreement above alleged, and of the written agreements hereinafter set forth, there came into existence between the plaintiff and the defendant, a joint adventure, a partnership, a co-tenancy, and a joint tenancy, and the fiduciary obligations and duties incident to such relationship.*" (Italics ours.) . . .

He further averred: "16th. On all the dates mentioned in this pleading and the plaintiff's pleading, the plaintiff owed unto the defendant and unto the said business enterprise of the plaintiff and the defendant, a fiduciary relationship and the duties and obligations arising therefrom, which duties and obligations were breached by the plaintiff as disclosed in this pleading."

Our view is that notwithstanding the fact that Winn's defense on the first trial was based primarily on a verbal contract between him and Warner prior to the execution of the contracts of February 2, 1937, nevertheless this pleading did raise the issue that whatever title Warner acquired in the gas rights in the Quinlan lease were acquired by Warner in trust for their joint enterprise, but we do not think we can say that he relied solely on such verbal agreement. It is true that in Winn's amended pleading on which he went to trial in the cause now before us, he did not specifically plead in detail the verbal contract between him and Warner, as on the first trial, but by referring to the last part of paragraph 5, which we have italicized, we cannot say that Winn did not rely in the second trial on both oral and written agreements which he had with Warner to establish his interest in the Quinlan lease by virtue of the trust relationship existing between them. It is true that Winn's pleading in the second trial sets out with more clarity his two major defenses, which are substantially: (1) that a fiduciary relationship existed between him and Warner by virtue of the existence of the joint adventure or partnership for the production and sale of gas from the Lopena Gas Field, which joint adventure or partnership was created between them by virtue of the "agreement above alleged and of the written agreements hereinafter set forth"; and (2) that when Winn acquired the title to the gas rights in the Quinlan lease and undertook to produce and sell gas therefrom to the exclusion of Winn, such conduct was antagonistic to and in direct competition with

the business of the joint adventure then existing between them.

■■■■■■ Therefore, the exact question here presented is: *Did the Honorable Fourth Court of Civil Appeals write the applicable law of the case before us when it said* [172 S.W.2d 527]: *"Appellant contends that he and appellee had entered into a joint adventure and that such joint adventure applied to all leases owned by appellee in the Lopena Field, whether described in the written contract or not. We overrule this contention. The contract was in writing and complete in every respect and it would be varying its written terms by parol testimony to show that the joint adventure applied to other leases than those fully described in the contract"?* (Italics ours.) We think not. The opinion shows that the judgment of the trial court was reversed and remanded on appellant's first point which assailed the court's charge on the measure of damages. The record shows that the first case was tried under our new rules. Winn did not file a motion for peremptory instruction as provided by Rule 268, T.R.C.P., nor did he file motion for judgment non obstante veredicto as provided in Rule 301, T.R.C.P. He did file his requested special issue No. 1, which provided: "You are hereby instructed to return a verdict for the defendant", which issue the court refused. It is obvious that this request was insufficient to comply with Rule 268, supra. See Wright v. Carey, Tex.Civ.App., 169 S.W.2d 749, point 8, p. 753, and Roberts v. Shell Pipe Line Corp., Tex.Civ.App., 175 S.W.2d 106, point p. 108. In the case of Kansas City Life Ins. Co. v. Duvall, 129 Tex. 287, 104 S.W.2d 11, and on motion for rehearing, p. 13, Mr. Justice Taylor, speaking for the Supreme Court, said: "The fact we intended to call attention to by the reference to 'plaintiffs' is that one of the reasons for not here rendering judgment in favor of plaintiffs is that they did not seek a peremptory judgment upon the trial, either by motion for an instructed verdict or by motion non obstante veredicto."

The foregoing statement is applicable in part to Winn's exact situation on the first appeal. It is obvious that neither the Court of Civil Appeals nor the Supreme Court could have reversed and rendered this cause for Winn on the first appeal, assuming that each court was of the opinion that on the first trial the pleadings raised the issue of joint enterprise and the evidence established without dispute the question of the existence of a relation of trust and confidence between Warner and Winn, and that by virtue thereof the Quinlan lease became impressed with a constructive trust in favor of Winn. On the second trial, Winn did file a motion for peremptory instruction wherein he set out the specific reasons as to why the doctrine of constructive trust created by reason of the relationship growing out of the joint enterprise impressed the Quinlan lease with an interest in favor of Winn, and the trial court could have given an instructed verdict for Winn on the second trial if it had shared the view expressed by us, or it could have granted Winn a judgment on motion non obstante veredicto. Notwithstanding the fact that both Warner and Winn made applications for writ of error to the Supreme Court, and each application was dismissed for want of merit, our view is that since the Honorable Fourth Court reversed and remanded the cause for an error in the charge, as fully shown in its opinion, such opinion is not the law of this case as here presented. Rule 483, T.R.C.P., provides in part: "In all cases where the judgment of the Court of Civil Appeals is a correct one but the Supreme Court is not satisfied that the opinion of the Court of Civil Appeals in all respects has correctly declared the law, it will refuse the application with the docket notation, 'refused for want of merit.'" " 'Dictum' is defined to be: 'An opinion expressed by a court, but which, not being necessarily involved in the case, lacks the force of an adjudication; an opinion expressed by a judge on a point not necessarily arising in a case; an opinion of a judge which does not embody the resolution or determination of the court, and made without argument, or full consideration of the point; not the professed deliberate determination of the judge himself.'" Grigsby v. Reib, 105 Tex. 597, 153 S.W. 1124, point 6, p. 1126, L.R.A.1915E, 1, Ann.Cas. 1915C, 1011.

Believing that this cause has been fully developed from Warner's standpoint on this vital issue (which is controlling), the judgment of the trial court is reversed and judgment is here rendered that Warner take nothing against Winn.