**44**

Roy M. **HUFFINGTON**, Individually and
Roy M. Huffington, Inc.,
Appellant,

v.

Haden **UPCHURCH**, Appellee.

No. 1083.

Court of Civil Appeals of Texas,
Houston (14th Dist.).

April 2, 1975.

Rehearing Denied April 30, 1975.

Alfred H. Ebert, Jr., Paul E. Harris, Thomas L. Schubert, Andrews, Kurth, Campbell & Jones, Houston, Frank G. Harmon, Baker & Botts, Houston, for appellant.

Fred Parks, Houston, Sloan B. Blair, Howard G. Barker, Cantey, Hanger, Gooch, Cravens & Munn, Fort Worth, for appellee.

CURTISS BROWN, Justice.

Appellant, Roy M. Huffington, (Huffington) and appellee, Haden J. Upchurch, (Upchurch) are business acquaintances and friends of long standing. Huffington is a well-educated and competent geologist. He also is a talented business man and fund raiser. Upchurch is a licensed lawyer but has never practiced law. He is an experienced landman as that term is understood in the oil industry. Huffington is joined as appellant by the corporation Roy M. Huffington, Inc. (Inc.) which he formed in 1958. From formation (until at least 1970) Huffington was its sole and only stockholder. He served as Chairman of the Board, President, and Treasurer of the corporation. The other directors were either attorneys or employees of the company. Under the circumstances it is not surprising that Huffington dominated his wholly owned corporation.

Inc. became involved in a number of activities including shrimping, a processing plant, real estate and oil and gas programs. In the latter connection, Inc. would put together oil and gas "prospects" which it regarded as worthwhile and secured funds principally from those in a position to obtain tax benefits under our income tax laws. In general, these drilling programs provided for a certain portion of the money to be allocated to Inc. to cover its expenses. In the event the property proved productive, Inc. would obtain a reversionary interest upon pay-out of the original investment. Inc. was permitted to and did invest its own funds on occasion in the drilling programs it presented to its investors. Huffington contacted Upchurch in 1963 for his advice as to some competent landman that he might consider for employment. Upchurch suggested himself and became an employee of Inc. that year. R. E. Warren was already with the company as Chief Geologist and in 1964 Mr. Paul T. Scott joined Inc. as Production Engineer.

As an incentive to its key employees (Huffington, Upchurch, Warren and Scott) Inc. entered into written agreements giving such employees a percentage of the earned reversionary interests.

In 1965 the Fifth Circuit[1] decided a case which was subject to the debatable interpretation that the entire reasonable value of the reversionary interest earned by the employees of Inc. could be taxed as current income to the employee in the year of vesting even though no significant moneys had actually been realized. There is a dispute in the evidence as to the significance of this case in bringing about the formation of the partnership between the parties. Appellants contend that concern over this

1. United States v. Frazell, 335 F.2d 487 (5th Cir. 1964), cert. denied 330 U.S. 961, 85 S.Ct. 1104, 14 L.Ed.2d 152 (1965).

tax case was the sole reason for the formation of the partnership. Appellee takes the position that although the tax decision may have to some extent initiated discussions of the manner in which the parties had been doing business that inquiry revealed that there was no justifiable fear of the application of the Frazell case to Inc.'s manner of operation. Appellee asserts that the partnership was formed to go into the oil and gas business and not solely for tax reasons.

As we view it, this dispute becomes somewhat academic, because it is undisputed that Huffington, Upchurch, Warren and Scott entered into a written partnership agreement. This partnership agreement is set out in full as an appendix following this opinion. In accordance with its terms it was renewed in writing for the years 1966, 1967 and 1968. It was not renewed in 1969 and the partnership expired by its own terms at midnight December 31, 1968. It was, however, in force during the critical year of 1968.

As retained consultants for Inc., the members of Huffington Associates (the partnership) continued very much as they had as employees of Inc. Each occupied the same office and performed the same functions and were compensated by partnership draws in the same amount as their previous salary. Also, the interest in the partnership was established so as to permit each of the partners to share in the earned reversionary interest at the same rate as they had enjoyed previously.

In early 1968, Huffington learned that General Sproul of Virginia International Company (Vico) had contacts in the Indonesian Ministry dealing with oil and gas matters. Huffington and Sproul arranged a series of meetings in Indonesia. During these negotiations Huffington Associates, the partnership, and Inc. were trying to conduct business as usual. No doubt, both the partnership and Inc. were somewhat handicapped by the absence of Huffington, their respective Managing Partner, President, Chairman of the Board, and Treasurer. Following one of Huffington's early trips to Indonesia, Upchurch faced him with the direct question as to whether the partnership was in the Indonesian deal. He replied "Yes." He later undertook to explain this by stating that he had in his mind that "we could work out something." He stated that he had no conception of how that could be done but "we would see if we could get an interest in the project for each of them."

There is much detailed evidence of the negotiations in Indonesia. The operative fact is that on August 8, 1968, during the existence of the partnership, the managing partner, Huffington, procured a production sharing contract in the name of Inc. and for its benefit. Vico also, of course, had an original fifty percent interest in the production sharing contract. There is also much evidence concerning Inc.'s handling this interest after obtaining the concession. Essentially, Inc. entered into a joint venture agreement in May of 1969, effective August 8, 1968, as a result of which Inc. retained: (a) a 10% working interest; (b) a 1% overriding royalty interest; and (c) a right and option to convert the 1% overriding royalty interest to a working interest as defined and provided for in said joint venture agreement.

Throughout this controversy, Upchurch has stoutly maintained his entitlement to his partnership share in the oil and gas production sharing agreement obtained by the Managing Partner of his partnership and placed in the name of the corporation wholly owned and controlled by such partner individually.

Upon refusal of his last demand, appellee instituted this suit. Briefly stated Upchurch asserted breach of the partnership contract; breach by Huffington of the fiduciary relationship of a partner (especially a managing partner); fraud and conspiracy to defraud; breach of the trust relationship between Inc. and Associates; and that the production sharing contract

was a partnership asset by virtue of the terms of the partnership contract and that Inc. holds legal title to the asset as agent and nominee of Associates under the terms of the partnership contract. Other allegations were made, but are not essential to the disposition of this appeal.

The case was tried to a jury on special issues as follows:

## SPECIAL ISSUE NO. 1

Do you find from a preponderance of the evidence that it was the intent of the parties to the partnership agreement, as evidenced by their conduct, that during the existence of Huffington Associates, Roy M. Huffington, Inc., acting through its President, Roy M. Huffington, could no longer engage in any new oil and gas activity for its own benefit and that any such activity entered into thereafter by Roy M. Huffington, Inc. had to be undertaken solely for the benefit of Huffington Associates?

Answer "We do" or "We do not".

Answer "We do".

## SPECIAL ISSUE NO. 2

Do you find from a preponderance of the evidence that after the formation of the partnership it was the intention of the parties thereto, as evidenced by their conduct, that any partnership interest in any particular new oil and gas venture would be covered by a separate agreement between the partnership and other parties or entities.

Answer "We do" or "We do not".

Answer "We do not".

## SPECIAL ISSUE NO. 3

Do you find from a preponderance of the evidence that Haden J. Upchurch offered to pay his share, if any, of the expenses incurred in connection with negotiations leading up to the execution of the Production Sharing Contract prior to August 8, 1968?

Answer "We do" or "We do not".

Answer "We do".

The trial court impressed and enforced a constructive trust in favor of Upchurch of a 14.285% share in and to all of the interest created or retained by the joint venture agreement above mentioned standing in the name of Inc. including but not limited to: (a) 10% working interest; (b) 1% overriding royalty interest; (c) a right and option to convert the 1% overriding royalty interest to a working interest as defined and provided for in said contract along with same percentage share of all obligations, duties, responsibilities, expenses or payments attributable to the interests of Inc. created or retained by the joint venture agreement.

Appellants requested no special issues and did not object to the charge except to special issue number 3 on grounds not material to this appeal.

Appellants have assigned points making the following contentions: Appellants should have prevailed as a matter of law because (1) they owed no duty to appellee and (2) the partnership in general and appellee in particular could not and would not have accepted the project. Appellants further contend that their motion for new trial should have been granted because (a) the special issues submitted were not controlling; (b) appellee waived essential grounds of recovery; (c) appellee objected to issues number 1 and 2 and is estopped from recovering on them; (d) appellee having filed a motion for new trial as well as appellant the trial court was obligated to grant same; (e) that the partners not claiming an interest in the Indonesia project were necessary parties; (f) since appellee had historically been entitled to one-eighth interest in the properties earned by the associates, his recovery (if any) here should be limited to that percentage. Appellants also attack the legal sufficiency of the evidence to sustain special issue number 1.

Appellee, on the other hand, has properly assigned a cross-point contending that the

trial court should have included in the judgment a constructive trust upon his proportionate share of the Indonesian venture that resulted from the withdrawal of two of the partners. Appellee has also assigned a number of cross-points which might properly be characterized as protective in nature.

The parties do not greatly differ as to the law governing this case. However, they reach different conclusions based upon the circumstances, issues submitted by the court and tactics used by the parties. The Supreme Court spoke in Smith v. Bolin, 153 Tex. 486, 271 S.W.2d 93 (1954) at page 96:

In the case of Meinhard v. Salmon, supra, Salmon negotiated and obtained for himself a new lease on certain property which had been under lease by Salmon and Meinhard operating under a joint venture agreement. Salmon was the sole manager of the property. The new lease included some adjoining property not included in the original lease. The court sustained Meinhard's suit to establish his interest in the property, both the original and the adjoining property, on the theory of constructive trust for his benefit. The court, in an opinion by Chief Justice Cardozo, said [249 N.Y. 458, 164 N.E. 546]:

"Joint adventurers, like copartners, owe to one another, while the enterprise continues, the duty of the finest loyalty. Many forms of conduct permissible in a workaday world for those acting at arm's length, are forbidden to those bound by fiduciary ties. A trustee is held to something stricter than the morals of the market place. Not honesty alone, but the punctilio of an honor the most sensitive, is then the standard of behavior. As to this there has developed a tradition that is unbending and inveterate. Uncompromising rigidity has been the attitude of courts of equity when petitioned to undermine the rule of undivided loyalty by the 'disintegrating

erosion' of particular exceptions. Wendt v. Fischer, 243 N.Y. 439, 444, 154 N.E. 303. Only thus has the level of conduct for fiduciaries been kept at a level higher than that trodden by the crowd. It will not consciously be lowered by any judgment of this court. * * *"

As managing partner of their partnership enterprise, respondent owed his partners even a greater duty of loyalty than is normally required. In the Meinhard v. Salmon case, supra, the court said: "Salmon had put himself in a position in which thought of self was to be renounced, however hard the abnegation. He was much more than a coadventurer. He was a managing coadventurer. * * * For him and for those like him the rule of undivided loyalty is relentless and supreme." MacDonald v. Follett, 142 Tex. 616, 180 S.W.2d 334.

Justice Greenhill in Omohundro v. Matthews, 161 Tex. 367, 341 S.W.2d 401 (1960) stated:

Constructive trusts have been held to apply where there have been oral promises, or in spite of oral promises, in a number of related situations. Perhaps the most conspicuous of such cases are those dealing with partnership property. Id. at 407.

In connection with this latter holding, the Supreme Court cited with approval the Texas Juris quotation:

Land will be regarded as held in trust for the firm by agreement or by operation of law where it has been brought into the partnership * * * though title be held by the members as cotenants or by some and not all of them. Id. at 407 n. 7.

We are unable to agree with appellants' contentions that there was no evidence that the appellants breached any duty owing to the appellee. It is undisputed that the written partnership was in full force and effect for the calendar years 1966, 1967,

and 1968 by virtue of the provisions of the instrument and written extensions voluntarily entered into between the partners. Huffington conceded that upon execution of the written partnership agreement, he fully understood and intended that:

> Each of the parties hereto hereby agrees that they will become partners and do hereby associate themselves as partners in the art, trade and business of acting as consultants and engaging in the business of exploring, drilling, developing and producing oil, gas and other minerals and acquiring minerals and royalty interests as hereinafter more particularly set out.

He further acknowledged that Article III of the written partnership agreement stated:

> The purpose of the partnership shall be to acquire, own, develop and operate oil, gas and mineral leases, mineral interest and royalty interest, properties and prospects and to produce therefrom, and treat, transport, and market oil or gas, or both of them, or production derived therefrom.

The purpose clause also set forth thirteen specific activities of Huffington Associates, section 1 reading:

> 1. the purchase of working interests or undivided interests therein in oil or gas properties, leases, farmouts, prospects, mineral interests and royalty interests, which are producing or are capable of producing oil and gas, or either of them, in commercial quantities, as the managing partner herein named shall deem advisable and shall approve
> . . . ..

Section 4 reads:

> 4. acting as a consultant for others for a fee either in the form of cash or an interest by virtue of a sharing arrangement or agreement in connection with any of the matters set out in the paragraphs of this Article.

Article VI of the written partnership agreement appoints Huffington as the managing partner with the right to determine policy, method of operation and supervision of the management of the business. Subsection 12 of Article III expressly contemplates holding property in the name of Inc.:

> 12. The holding of title to partnership properties in the name of Roy M. Huffington, Inc., or any subsidiary of, or successor to, Roy M. Huffington, Inc., or such other nominee as the managing partner may determine.

The parties themselves in writing in the agreement defined the scope of permissible activities outside of the oil and gas business by the provision reading:

> Notwithstanding the foregoing enumeration of the purposes of this partnership, it is understood and agreed that this partnership is for the purpose only of conducting an oil and gas business and that each of the partners are free to conduct, in their individual capacities, or in association with others, any other business transactions *not* directly related to the business of acquiring mineral leases and other mineral or royalty interest and the exploration for and production of oil, gas and other minerals. (Emphasis ours)

 Appellants clearly were in a fiduciary relationship to Upchurch. Appellants clearly owed a duty to appellee. The imposition of a constructive trust was fully justified, based on the taking of the Indonesian oil and gas prospect for the benefit of Inc. to the exclusion of appellee. Johnson v. Peckham, 132 Tex. 148, 120 S.W.2d 786 (1938); Fitz-Gerald v. Hull, 150 Tex. 39, 237 S.W.2d 256 (1951).

 Appellants argue that the trial court failed to submit any controlling issues and that appellee failed to request such issues and that, therefore, appellee waived all grounds of recovery. Texas Rules of Civil Procedure 277, 279. We do not agree with either contention. This appears to be a case in which the often used

but rarely correct characterization of the charge being that of the "court" is appropriate. The protective cross-points of appellee and the transcript reflect numerous requested issues by Upchurch. No issues were requested by appellants. Without undertaking to read the mind of the trial court, the record would lead to the conclusion that it believed that the only possible fact issue in the case was whether the evidence relating to the tax reasons for the formation of the partnership, the similarity of the work and compensation before and after formation of the partnership, the fact that Inc. had entered into some of the program for its own account and other evidence may have constituted some evidence of an intent of the parties contrary to the partnership agreement. Since the burden of proof generally fell upon appellee, the court framed the issue in such fashion as to place the burden of proof upon him. Special Issue No. 2 had a similar purpose based upon the fact that the programs from year to year would vary in various specifics and Inc. might or might not take a portion of such program for its own benefit. Appellants objected neither to the form nor substance of these issues. Therefore, under Tex.R.Civ.P. 274 appellants have waived any objection to them. While we may have worded the issue differently, it is clear that the court intended to inquire if the parties to the partnership agreement intended that Huffington be precluded from operating Inc. for his own benefit to the exclusion of his partners. Thus, however imperfectly, it seeks a finding of a fiduciary relationship between Huffington, Upchurch and a nominor/nominee relationship between Inc. and Associates. A negative answer to those issues may have posed a question as to the applicability of the Parol Evidence Rule. We believe the issues meet the requisites of Tex.R.Civ.P. 277 in the absence of objections by appellants.

■ Appellants contend that there was no evidence of a breach of fiduciary relationship. It is undisputed that Huffington took the Indonesian oil and gas prospect in the name of his individually wholly owned corporation. The appellants' claim that they had established as a matter of law that the partnership could not and would not have undertaken the project is also without merit. Appellants did not object to the charge on the grounds that fact issues were presented in connection with these contentions. Consequently, if the issues of fact were presented, they would be deemed as found by the trial court in such manner as to support its judgment. Tex. R.Civ.P. 279. There is ample evidence that appellee consistently asserted his right to his interest in the oil and gas prospect, and that the nature of the project was such as to require some outside funding in any event. The jury found that Upchurch offered to pay his share of the expenses incurred in connection with the negotiations. No objection was made, nor special issue requested, as to whether appellee was ready, willing and able to accept his partnership share in the oil and gas project.

■ We also overrule appellants' ingenious contention that since appellee filed objections to the court's charge he is estopped to rely on the verdict. The mere fact that a party has exercised his right to object to the court's charge under the provisions of Rule 272 cannot be made the basis of judicial estoppel. Frequently, both parties object to all issues submitted. Under appellants' view the court in such a case would be estopped from rendering judgment on the verdict for either party. It is well settled, of course, that if one is entitled to one of several inconsistent remedies and makes an election and prosecutes such remedy to final judgment and receives anything of value under the claims thus asserted, he is estopped from adopting a contrary position in later litigation. Seamans Oil Co. v. Guy, 115 Tex. 93, 276 S. W. 424 (1925, opinion adopted). Such judicial estoppel requires that a party be successful in maintaining a position before it is estopped from later attacking the same. Smith v. Chipley, 42 S.W.2d 645 (Tex.Civ.

App.—Amarillo 1931, writ ref'd). Certainly the doctrine has no application to an objection by a party to the court's charge.

■ Appellants take the position that because both parties filed motions for new trial in the trial court, such court was compelled to grant one of them. Appellants have found no authorities to support this startling proposition and we have been unable to find any. The taxpayers of this State and County have some legitimate interest in the finality of judicial processes. The trial court is not compelled to grant a new trial simply because motions for same are filed by all the litigants.

■ Scott and Warren withdrew from the partnership and executed letters listing the properties in which they claimed an interest. The Indonesian oil and gas prospect was not among them. They, in effect, abandoned any claim with respect to this prospect. Appellants contend that they are indispensable parties under Tex.R.Civ.P. 39. Appellee's trial pleadings sought relief only against appellants. In Cooper v. Texas Gulf Industries, Inc., 513 S.W.2d 200 (Tex.Sup.1974), the Supreme Court construed amended Rule 39, Tex.R.Civ.P. (1971) and announced a departure from Petroleum Anchor Equipment, Inc. v. Tyra, 406 S.W.2d 891 (Tex.Sup.1966). The Supreme Court decided that the principal factor in determining this question now is whether the court *ought* to proceed with those who are present. One of the practical matters the Court took into consideration is the fact that the case actually had been tried as to those parties who were present and there was no objection at the trial level concerning the nonjoinder of a party. In this case there was no such objection until after verdict. No preliminary plea in abatement or other motion attacking the court's jurisdiction has been brought forward. Furthermore, the former partners who were not parties to this action assert no claim to the project in question. We therefore conclude, as did the Supreme Court in *Cooper, supra,* that the court ought to have proceeded with those present in this case as it in fact did.

■ Appellants' final point and appellee's first cross-point will be considered together. Appellants argue that equity compels Upchurch receive no more than 12.5% interest. This position is based upon their demonstration that the practical effect of the agreements between Associates and Inc. was to vest Upchurch with a ⅛th interest in the earned revisionary interest of the projects promoted by Inc. and Associates. Appellee points out that the partnership agreement clearly provides that his interest be 14.285%. In his cross-point he contends that he is entitled to his proportionate partnership share of the interest in the Indonesian project abandoned by Warren and Scott by the execution of the letters above referred to. We sustain this cross-point. We perceive of no reason why Huffington would be entitled to all of the interests abandoned by Warren and Scott. It is equitable that the partners share in this interest prorata. The parties stipulated that in the event Upchurch is entitled to his proportionate part of the interest of the other partners that the percentage would be Huffington 80% and Upchurch 20%. The judgment is therefore modified to provide that the constructive trust impressed and enforced in favor of Upchurch is a 20% share in and to all of the interests created or retained by the joint venture agreement of May 19, 1969, effective August 8, 1968 standing in the name of Roy M. Huffington, Inc., including but not limited to: (a) a 10% working interest; (b) a 1% overriding royalty interest; (c) a right and option to convert said 1% overriding royalty interest to the working interest as defined and provided for in said contract along with the same percentage share of all obligations, duties, responsibilities, expenses or payments attributable to the interests of Roy M. Huffington, Inc. created or retained by the joint venture agreement. As modified, we affirm. All of appellants' points have been carefully considered and are overruled. Appellee's protective cross-points need not be considered.

Modified and affirmed.

APPENDIX

PARTNERSHIP AGREEMENT
OF HUFFINGTON ASSOCIATES

THE STATE OF TEXAS ⎱
COUNTY OF HARRIS ⎰

THIS AGREEMENT made and entered into on this 28th day of December, 1965, by and between ROY M. HUFFINGTON, HADEN J. UPCHURCH, R. E. WARREN and PAUL T. SCOTT, all residents of Houston, Harris County, Texas,

## WITNESSETH:

### ARTICLE I.

Each of the parties hereto hereby agrees that they will become partners and do hereby associate themselves as partners in the art, trade and business of acting as consultants and engaging in the business of exploring, drilling, developing and producing oil, gas and other minerals and acquiring mineral and royalty interests as hereinafter more particularly set out, under the firm name and style of HUFFINGTON ASSOCIATES, effective as of and commencing on the first day of January, 1966, upon the terms and conditions hereinafter set out in this agreement.

### ARTICLE II.

The principal office of such partnership shall be located at 2210 Tennessee Building, Houston, Texas 77002, or at such other place or places as the partners may hereafter mutually agree upon for that purpose.

### ARTICLE III.

The purposes of the partnership shall be to acquire, own, develop and operate oil, gas and mineral leases, mineral interests and royalty interests, properties and prospects and to produce therefrom and treat, transport and market oil or gas, or both of them, or production derived therefrom. Such purposes shall be accomplished through:

1. the purchase of working interests or undivided interests therein, in oil or gas properties, leases, farmouts, prospects, mineral interests and royalty interests, which are producing or are capable of producing oil and gas, or either of them, in commercial quantities, as the managing partner herein named shall deem advisable and shall approve;

2. the conducting of geological and geophysical investigations on prospective oil and gas properties, including, without limitation, the exploration thereof through the use of seismograph, gravity meter and other scientific means and methods of exploration;

3. the drilling, reworking, equipping, plugging back or deepening either alone or in conjunction with others, of such wells as the managing partner may determine;

4. acting as a consultant for others for a fee either in the form of cash or an interest by virtue of a sharing arrangement or agreement in connection with any of the matters set out in the paragraphs of this Article;

5. the employment of such personnel and the establishment of such facilities as in the judgment of the managing partner may be necessary or advisable;

6. the employment of such legal, accounting, geological, geophysical and engineering services and advice as may be necessary or advisable in the judgment of the managing partner;

7. the operating of producing properties, the entering into of any operating agreement or agreements with others with respect to properties owned by such others or in which the partnership may have an interest, containing such terms, provisions and conditions as the managing partner may approve, and the amendment, revision or termination of any operating agreement;

8. the borrowing of money from banks and other lending institutions for all purposes of the partnership, and the pledging of partnership properties and the production therefrom to secure the repayment of the sums so borrowed as may be approved by the managing partner;

9. the administration of non-producing properties for the partnership or for others;

10. the treating, transporting and marketing of oil and gas, and the execution of division orders, gas sales contracts and other marketing agreements as may be approved by the managing partner;

11. the sale of one or more payments from production from properties owned by the partnership;

12. the holding of title to partnership properties in the name of Roy M. Huffington, Inc. or any subsidiary of, or successor to, Roy M. Huffington, Inc., or such other nominee as the managing partner may determine;

13. without limitation by the foregoing, any acts or activities advisable or necessary in the judgment of the managing partner in conducting the affairs of the partnership.

Notwithstanding the foregoing enumeration of the purposes of this partnership, it is understood and agreed that this partnership is for the purpose only of conducting an oil and gas business, and that each of the partners are free to conduct, in their individual capacities, or in association with others, any other business transactions not directly related to the business of acquiring mineral leases and other mineral or royalty interests and the exploration for and production of oil, gas and other minerals.

## ARTICLE IV.

To accomplish the foregoing purposes, each partner has upon this date paid into the partnership, as a capital contribution, the sum of money set out in figures opposite his name as follows:

| | |
|---|---|
| Roy M. Huffington | $571.42 |
| Haden J. Upchurch | $142.86 |
| R. E. Warren | $142.86 |
| Paul T. Scott | $142.86 |

## ARTICLE V.

Each of the partners will at all times during the continuance of this partnership give his attendance to, and to the utmost of his skill and power shall exert himself for, the joint interest, benefit and advantage of said partnership business.

## ARTICLE VI.

Roy M. Huffington is hereby designated as the managing partner of said partnership, and as such managing partner shall determine the policy and method of operation of the partnership. Said managing partner shall likewise have supervision of the management of the business and the assignment of duties and shall preside at all meetings of the partnership. In the event of the incapacity of Roy M. Huffington to act as managing partner, then the remaining partners shall, by majority vote, elect a successor managing partner.

## ARTICLE VII.

The duties of each of the parties hereto shall be generally as follows:

Roy M. Huffington shall act and have all of the rights and duties as are outlined in this agreement for the managing partner.

Haden J. Upchurch shall be in charge of, and shall perform all of the functions relating to, lease acquisitions, records, rentals and all of the other duties pertaining to the land department of the partnership. He shall also be in direct charge of the supervision of legal matters.

R. E. Warren shall perform the functions of chief geologist and shall be in direct charge of supervision of all geological, geophysical and other exploration work of the partnership.

Paul T. Scott shall perform the functions of chief engineer and shall be in direct supervision and control of any and all matters pertaining to drilling, producing and operating of partnership properties.

## ARTICLE VIII.

All profits and losses, if any, during the term of this agreement, and any and all interests acquired by the partnership in producing properties as the result of a sharing arrangement or agreement entered into by and between the partnership and others in connection with any exploration or development program, and any other assets, shall be apportioned and divided among and shall be owned by the partners in the following percentages:

| | |
|---|---|
| Roy M. Huffington | 57.1429% |
| Haden J. Upchurch | 14.2857% |
| R. E. Warren | 14.2857% |
| Paul T. Scott | 14.2857% |

## ARTICLE IX.

There shall be kept, during the term of this agreement, just and true books of account, which said books shall be used in common by the partners so that either of them may have access thereto without any interruption or hindrance by the others; such books shall be kept at the principal office of said partnership and shall not be removed therefrom by any of the partners, except with the consent of all of the members of said partnership. The books of the partnership shall be audited annually by a reputable firm of certified public accountants, a copy of whose certified report shall be furnished to each of the partners. The books of the partnership shall be kept on a calendar year basis. The partnership funds shall be kept in a Houston bank in a partnership account, and withdrawals therefrom may be made upon the signature of any one of the partners.

## ARTICLE X.

The partnership shall continue for a period of one (1) year from January 1, 1966, and for as long thereafter as the partners may, by written agreement, extend said term.

## ARTICLE XI.

Each of the partners shall be entitled to an annual drawing account, payable in monthly installments during each calendar year, of an amount to be determined by the managing partner. Unless changed by the managing partner, each partner's annual drawing account shall be in the following amounts:

| | |
|---|---|
| Roy M. Huffington | $1,500.00 |
| Haden J. Upchurch | $1,500.00 |
| R. E. Warren | $1,350.00 |
| Paul T. Scott | $1,500.00 |

The total amount of such drawing accounts shall be contingent upon the earnings of the partnership, but shall be charged as a partnership expense prior to the determination of the profits and losses for the year.

## ARTICLE XII.

In the event of the death of a partner during any year during which this partnership shall continue in existence, the partnership shall not be dissolved, but shall continue during the calendar year in which the death of such partner occurred, and the personal representatives of the deceased partner shall continue to be entitled to share and receive the interest of the deceased partner in partnership income accruing during the balance of such year. Such personal representatives shall not, however, become partners. At the end of the year in which the death of any partner shall occur, the partnership shall be dissolved, and the personal representatives of the deceased partner shall thereafter have no further interest in the partnership business, the property, capital and effects of the partnership.

In the event any partner shall at any time, for any cause, withdraw from the partnership, then the interest of such partner in any leasehold interest, mineral interest or royalty interest in any producing or non-producing properties theretofore acquired by the partnership shall be thereupon assigned to said withdrawing partner, and such withdrawing partner shall be paid his pro rata share of the book value of all other assets belonging to the partnership, but it is expressly understood and agreed that no value shall be assigned to good will. Thereafter such withdrawing partner shall have no further interest in any other assets or property of the partnership. The withdrawal of such partner shall not have the effect of terminating the partnership. It is further understood and agreed that any losses accrued or incurred by the partnership prior to the time of the withdrawal of any partner shall be shared by the withdrawing partner and all other partners pro rata.

## ARTICLE XIII.

At the end of the term of this agreement, or any extension thereof, or earlier termination of said partnership by dissolution, the partners shall each to the other make a true, just and final accounting of all things relating to the partnership business, and the property, capital and effects, as well as the gains and increases thereof, which shall be remaining, shall be divided in proportion to the respective interest of the parties hereto in said partnership properties at the time of such dissolution.

## ARTICLE XIV.

This agreement shall be binding upon and inure to the benefit of the parties hereto and their respective heirs, executors, administrators and assigns.

EXECUTED in multiple originals, each of equal dignity, but all of which taken together shall constitute one agreement on this the 28th day of December, 1965, but effective as of the first day of January, 1966.

/s/ Roy M. Huffington
ROY M. HUFFINGTON

/s/ Haden J. Upchurch
HADEN J. UPCHURCH

/s/ R. E. Warren
R. E. WARREN

/s/ Paul T. Scott
PAUL T. SCOTT

THE STATE OF TEXAS 
COUNTY OF HARRIS

BEFORE ME, the undersigned authority, on this day personally appeared ROY M. HUFFINGTON, known to me to be the person whose name is subscribed to the foregoing instrument and acknowledged to me that he executed the same for the purposes and consideration therein expressed.

GIVEN UNDER MY HAND AND SEAL OF OFFICE this the 28th day of December, 1965.

/s/ Rosa Lea Spaugh
Notary Public in and for
Harris County, Texas

THE STATE OF TEXAS
COUNTY OF HARRIS

BEFORE ME, the undersigned authority, on this day personally appeared HADEN J. UPCHURCH, known to me to be the person whose name is subscribed to the foregoing instrument and acknowledged to me that he executed the same for the purposes and consideration therein expressed.

GIVEN UNDER MY HAND AND SEAL OF OFFICE this the 28th day of December, 1965.

/s/ Charlene Williams
Notary Public in and for
Harris County, Texas

THE STATE OF TEXAS
COUNTY OF HARRIS

BEFORE ME, the undersigned authority, on this day personally appeared R. E. WARREN, known to me to be the person whose name is subscribed to the foregoing instrument and acknowledged to me that he executed the same for the purposes and consideration therein expressed.

GIVEN UNDER MY HAND AND SEAL OF OFFICE this the 28th day of December, 1965.

/s/ Charlene Williams
Notary Public in and for
Harris County, Texas

THE STATE OF TEXAS
COUNTY OF HARRIS

BEFORE ME, the undersigned authority, on this day personally appeared PAUL T. SCOTT, known to me to be the person whose name is subscribed to the foregoing instrument and acknowledged to me that he executed the same for the purposes and consideration therein expressed.

GIVEN UNDER MY HAND AND SEAL OF OFFICE this the 28th day of December, 1965.

/s/ Charlene Williams
Notary Public in and for
Harris County, Texas